OPINION
PAEZ, Circuit Judge:
Congress passed the Telecommunications Act of 1996 (“the Act”), Pub.L. 104- *1118 104, 110 Stat. 56 (codified in part at 47 U.S.C. §§ 251-261), to foster competition in local and long distance telephone markets by neutralizing the competitive advantage inherent in incumbent carriers’ ownership of the physical networks required to supply telecommunication services. Sections 251 and 252 of the Act require established incumbent local exchange carriers (“ILECs”)[1] to allow new competitive local exchange carriers (“CLECs”) to interconnect with their existing networks. See 47 U.S.C. §§ 251, 252.
In addition, all local exchange carriers are required to “establish reciprocal compensation arrangements [in their interconnection agreements] for the transport and termination of telecommunications.” 47 U.S.C. § 251(b)(5). These compensation provisions allow ILECs and CLECs to negotiate the terms under which they will terminate calls from each other’s customers. One of the negotiated terms in an interconnection agreement is the amount of reciprocal compensation that an ILEC will pay to a CLEC when an ILEC customer calls a CLEC customer, and vice versa.[2] These new arrangements under §§ 251 and 252 of the Act have generated significant regulatory battles and litigation between ILECs, the long-established telephone companies that were providing local telecommunication services before 1996, and CLECs, the new competitors that entered the telecommunications market after the passage of the Act and now seek to take advantage of the new competitive environment.
When Congress drafted the Act, it did not foresee the dramatic increase in Internet usage and the subsequent increase in telecommunications traffic directed to Internet Service Providers (“ISPs”) like America OnLine or Earthlink. Not long after Congress adopted the Act, newly formed CLECs began targeting ISPs to benefit from the reciprocal compensation provisions in interconnection agreements and the compensation they would receive from the one-way traffic that flows into ISP customers but does not flow in the opposite direction.
For example, when an Internet user with telephone service provided by an *1119 ILEC, like Pacific Bell, connects to the Internet, the user may dial into an ISP served by a CLEC, like Appellee Pac-West Telecomm, Inc. (“Pac-West”). Under the reciprocal compensation provisions of the interconnection agreement, Pacific Bell must pay the CLEC for the completion of its customer’s call to the ISP. The Internet user will likely make many extended calls to the ISP, but the ISP will rarely call the Pacific Bell customer. Thus, CLECs with ISP customers receive far more compensation from the ILEC for completing its customers’ calls than they pay to the ILEC because ISPs do not reciprocate with calls back to the originating ILEC.
These three consolidated appeals arise from a dispute over the inclusion of telecommunications traffic bound for ISPs in the reciprocal compensation provisions of interconnection agreements between ILECs and CLECs. In two of the appeals, Appellants[3] Pacific Bell and Verizon California (“Verizon”), two ILECs, challenge the district court’s summary judgment in favor of Appellees.[4] The district court upheld two generic rulemaking orders by the California Public Utilities Commission (“CPUC”). The generic orders required that reciprocal compensation provisions in interconnection agreements in California apply to calls made to ISPs. In the third consolidated appeal, Pacific Bell challenges the results of an arbitration proceeding before the CPUC in which the CPUC approved an arbitrated interconnection agreement between Pacific Bell and Pac-West that required reciprocal compensation for calls to ISPs.
First, we address Appellees’ challenge to our jurisdiction. We conclude that after the Supreme Court’s decision in Verizon Maryland, Appellees’ jurisdictional challenge must fail. Verizon Md., Inc. v. Pub. Serv. Comm’n, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). The Eleventh Amendment does not bar Appellants’ claims against the CPUC and there is nothing in the Act that limits federal question jurisdiction under 28 U.S.C. § 1331. Second, we conclude that the CPUC’s generic orders are contrary to the Act because they exceed the CPUC’s statutory authority under § 252 over interconnection agreements, and accordingly reverse the district court’s summary judgment rulings in appeal numbers 01-17181 and 01-17161. Finally, we affirm the district court’s summary judgment ruling in appeal number 01-17166, and thereby uphold the CPUC’s Order approving the Pacific Bell/Pac-West interconnection agreement because the arbitrated agreement between Pac-West was consistent with the Act.
I. Statutory Framework
Sections 251 and 252 of the Act require ILECs to allow CLECs to interconnect with their existing networks. See 47 U.S.C. §§ 251, 252. In addition, all local exchange carriers are required to “establish reciprocal compensation arrangements for the transport and termination of telecommunications.” Id. Under the Act, “re *1120 ciprocal compensation” means that when a customer of one local exchange carrier calls a customer of a different local exchange carrier who is within the same local calling area, the first carrier pays the second carrier for completing, or “terminating,” the call. Under the Federal Communications Commission’s (“FCC”) current regulations, § 251(b)(5)’s mandatory reciprocal compensation obligations “apply only to traffic that originates and terminates within a local area.” In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 (First Report & Order), 11 F.C.C.R. 15499, 16013 (¶ 1034), 1996 WL 452885 (1996) (subsequent history omitted).
The Act directs the ILECs and the CLECs to negotiate in good faith to reach an agreement over the terms of an interconnection arrangement. See 47 U.S.C. §§ 251(c)(1), 252(a).[5] If an ILEC and a CLEC are unable to agree, the Act provides for binding arbitration by the state public utilities commission. See id. at § 252(b). After a state commission approves an arbitrated agreement, any “aggrieved” party to the agreement may bring an action in district court “to determine whether the agreement ... meets the requirements” of the Act. See id. at § 252(e)(6). Once the terms are set, either by agreement or arbitration, and the state commission approves the agreement, it becomes a binding contract.
II. Procedural History
A. The CPUC Generic Orders and the FCC’s Implementation Orders
On March 18, 1998, the California Telecommunications Coalition (“the Coalition”),[6] an “ad-hoc” group of CLECs (including many of the CLEC Appellees), petitioned the CPUC for an order declaring that calls to ISPs should be treated as local traffic subject to reciprocal compensation provisions in interconnection agreements. The CPUC agreed and issued an order on October 22, 1998, Decision No. 98-10-057 (Oct. 22, 1998) (“First CPUC Order”).
In the First CPUC Order, the CPUC concluded that ISP traffic was intrastate for jurisdictional purposes and local for purposes of interconnection agreements. It reasoned that ISP traffic is comprised of two separate components, one of which is a telecommunications service and the other of which is an information service, and that the first of these components — the tele *1121 phone call to an ISP’s modem — terminates at the modem. The CPUC concluded that, if the customer who originates the call and the ISP modem that receives the call are both within the same local calling area, then the call is local, and that “reciprocal compensation provisions applicable to interconnection agreements should apply to the[m] as they do to any other local calls.” The CPUC therefore ordered that “[a]ll carriers subject to interconnection agreements containing reciprocal compensation provisions are directed to make appropriate reciprocal payment called for in such agreements for the termination of ISP traffic which would otherwise qualify as a local call[.]” First CPUC Order, Decision No. 98-10-057, at 22. In reaching its decision, the CPUC did not consider or analyze any specific interconnection agreement.
After the CPUC issued its order, the FCC addressed whether 47 U.S.C. § 251(b)(5) required reciprocal compensation payments for ISP traffic. In the Matter of Implementation of the Local Competition Provision in the Telecommunications Act of 1996 (FCC Declaratory Order), 14 F.C.C.R. 3689 (1999), vacated, Bell Atl. Tel. Co. v. FCC, 206 F.3d 1 (2000). The FCC concluded that ISP traffic does not terminate at an ISP’s modem, and should not be considered as comprising two distinct calls. Id. at 3698 (¶ 13). The FCC instead used an “end-to-end” analysis to conclude that, for jurisdictional purposes, ISP traffic was substantially interstate. Id. at 3701-02 (¶ 18). On the basis of that conclusion, the FCC further determined that the reciprocal compensation provisions of 47 U.S.C. § 251 and its implementing regulations “do not govern inter-carrier compensation for” ISP traffic. 14 F.C.C.R. at 3706 n. 87 (¶ 26).
Because it had not yet promulgated final rules covering inter-carrier payment for ISP traffic, the FCC also concluded that the ILECs and the CLECs could “voluntarily include this traffic within the scope of their interconnection agreements.” Id. at 3703 (¶ 22). “Where the parties have agreed to include this traffic,” it held, “they are bound by those agreements, as interpreted and enforced by the state commissions.” Id.
On July 22,1999, the CPUC modified its First Order in light of the FCC Declaratory Order, repudiating its jurisdictional • analysis, but reaching the same result— that “reciprocal compensation provisions of applicable interconnection agreements applied to ISP-bound traffic in California.” Decision No. 99-07-047, 12 (Jul. 22, 1999) (“Second CPUC Order”). The CPUC also rejected Appellants’ arguments that an ev-identiary hearing was warranted, and that the generic orders constituted a “wholesale revision” of their interconnection agreements. Instead, it emphasized that its generic orders were the product of “a rule-making proceeding,” pursuant to the CPUC’s “legislative authority.” “In such instances,” it held, “the requirements are purely statutory and the agency is not circumscribed by the concept of due process or other restrictions applicable to judicial or quasi-judicial proceedings.” Id.
On March 24, 2000, the D.C. Circuit vacated the FCC Declaratory Order for “want of reasoned decisionmaking.” Bell Atl. Tel. Co. v. FCC, 206 F.3d 1, 3 (D.C.Cir.2000). The D.C. Circuit rejected the FCC’s attempt to extend the “end-to-end” analysis for the purpose of determining jurisdiction to the broader purpose of determining whether a call to an ISP fits into the local call model of two collaborating local exchange competitors. Id. at 5-6. In its ruling, the D.C. Circuit noted that, “[hjowever sound the end-to-end analysis may be for jurisdictional purposes, the Commission has not explained why viewing these linked telecommunications as continuous works for purposes of reciprocal com *1122 pensation.” Id. at 7. The D.C. Circuit vacated the FCC’s ruling and remanded the case to the FCC.
On April 19, 2001, the FCC announced the adoption of new rules to clarify the appropriate intercarrier compensation for telecommunications traffic delivered to ISPs. In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of1996, Intercar-rier Compensation for ISP-Bound Traffic, 16 F.C.C.R. 9151, 9152-53 (2001) (FCC Remand Order). The FCC reached the same conclusion it had reached in its first order, but through completely different reasoning. Abandoning the local versus interstate distinction, the FCC concluded that § 251(b)(5) applied to all telecommunications traffic except for categories specifically enumerated in § 251(g). The FCC then concluded that ISP-bound traffic falls within one of the § 251(g) exceptions — information access — and therefore was exempt from § 251(b)(5)’s reciprocal compensation requirements.
The FCC established a new hybrid interim compensation mechanism for ISP-bound traffic to “limit, if not end, the opportunity for regulatory arbitrage while avoiding a market disruptive ‘flash-cut’ to a pure bill and keep[7] regime.” FCC Remand Order, 16 F.C.C.R. at 9187 (¶ 77) (emphasis added). The interim provisions include a series of rate caps for ISP-bound traffic that decrease over time, a cap on the total number of minutes for which a local exchange carrier may receive compensation, and a rebuttable presumption that traffic exchanged between carriers that exceeds a 3:1 ratio of terminating to originating traffic is ISP-bound traffic subject to the interim compensation mechanism. Id. at 9155-57(¶ 8). The FCC also stated that in cases where carriers are not exchanging traffic pursuant to the interconnection agreements prior to the adoption of the FCC Remand Order, such carriers will be required to exchange ISP-bound traffic on a “bill and keep” basis during the interim period. Id. at 9188 (¶ 81). However, the FCC clearly stated that its Remand Order “does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions.” Id. at 9189 (¶ 82).
On May 3, 2002, the D.C. Circuit held that the FCC could not rely on § 251(g) as authority to create an exception under § 251(b)(5) for ISP-bound traffic, and remanded the FCC Remand Order to the FCC for further proceedings. WorldCom, Inc. v. FCC, 288 F.3d 429, 430 (D.C.Cir.2002). “Because that section [§ 251(g) j is worded simply as a transitional device, preserving various [local exchange carrier] duties that antedated the 1996 Act ... we find the Commission’s reliance on Section 251(g) precluded.” Id. Although the D.C. Circuit rejected the FCC’s reasoning with respect to § 251(g), the court declined to make any further determinations with regard to “bill-and-keep” and the other interim rules. Id. at 434. And significantly, the court did not vacate the Remand Order, reasoning that “many of the petitioners themselves favor bill-and-keep, and there is plainly a nontrivial likelihood that the Commission has authority to elect such a system.” Id. As a result, the FCC Remand Order remains in effect pending the *1123 FCC’s proceedings on remand. See, e.g., Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm’n, 988 F.2d 146, 150-51 (D.C.Cir.1993).
B. CPUC ARBITRATION OF THE PACIFIC Bell/Pac West Agreement
Before their existing agreement expired in June 1998, Pacific Bell and Pac-West entered into negotiations over the terms of a new interconnection agreement. Because they could not agree whether reciprocal payments would be required for ISP traffic, Pacific Bell requested arbitration before the CPUC pursuant to § 252. The arbitrator recommended that the new agreement’s reciprocal payment obligations apply to ISP traffic and rejected Pacific Bell’s proposed alternative payment schemes for this type of traffic. The arbitrated agreement also provided for lower reciprocal compensation rates than the prior agreement. On June 24, 1999, a divided CPUC adopted the final arbitrator’s report. Decision No. 99-06-088 (June 24, 1999) (the “Pac-West Order”).
Pacific Bell filed for rehearing, claiming, inter alia, that the CPUC’s decision was improperly influenced by “public and political clamor” and that the decision was based on extra-record material. The CPUC rejected this argument, and on December 2, 1999, denied Pacific Bell’s application for rehearing.
C. District Court Prooeedings
Appellants filed three actions in district court to challenge the CPUC’s rulings. Pacific Bell and Verizon each filed separate challenges to the CPUC’s generic orders. In their complaints, they sought declaratory and injunctive relief against the CPUC’s orders to the extent that the orders required Appellants to pay reciprocal compensation for ISP traffic. Pacific Bell and Verizon asserted federal court jurisdiction under 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1381. They alleged that these generic orders were inconsistent with the Act, or were otherwise arbitrary and capricious because the CPUC issued them without regard to specific interconnection agreements.
Pacific Bell also filed suit to challenge the Pac-West Order, alleging that the Order was unlawful for similar reasons. Pacific Bell further alleged that, with respect to the Pac-West Order, the CPUC improperly relied on ex parte communications and on information outside the record, and was thus improperly influenced by public and political opinion. These three suits were subsequently assigned to the same district court judge.
Appellees disputed Appellants’ claims on the merits and also argued that federal court jurisdiction was improper, that the suit was barred by the Eleventh Amendment, and that the Hobbs Act, 18 U.S.C. § 2342, barred the relief sought by Appellants. The district court rejected Appel-lees’ and the CPUC’s jurisdictional challenges, but entered summary judgment for them on the merits. It reasoned that the CPUC’s generic orders were neither inconsistent with nor preempted by federal law, and that the CPUC had authority to promulgate such orders because § 252(b) granted the CPUC a “statutory duty to resolve interconnection disputes between ILECs and CLECs [and to] ‘arbitrate any open issues.’ ” (quoting 47 U.S.C. § 252(b)(1)). With regard to the Pac-West Order, the district court also ruled that there was “no evidence that the CPUC was improperly influenced by public or political opinion in making its decision.” These timely appeals followed.[8]
*1124 III. Jurisdiction
As Appellees acknowledge, after the Supreme Court’s recent decision in Verizon Maryland, Inc. v. Public Service Commission, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), their jurisdictional arguments must fail. See also ACS of Fairbanks v. GCI Communication Corp., 321 F.3d 1215, 2003 WL 1062026 (9th Cir. 2003). In Verizon Maryland, the Supreme Court held that 28 U.S.C. § 1331 provides a basis for jurisdiction over an ILEC’s claim that a state regulatory commission’s order requiring reciprocal compensation for ISP-bound calls is preempted by federal law. Verizon Md., Inc. 122 S.Ct. at 1758. Although the Court declined to decide whether § 252(e)(6)[9] authorizes such review, it “agree[d] ... that even if § 252(e)(6) does not confer jurisdiction, it at least does not divest the district courts of their authority under 28 U.S.C. § 1331 to review the [State] Commission’s order for compliance with federal law.” Id.
Next, the Court held that the Eleventh Amendment did not bar Verizon Maryland’s claim against the state regulatory commission, because under Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), Verizon Maryland could proceed against the commissioners of the state regulatory commission in their official capacities. Id. at 1760. The Court explained that Verizon’s “prayer for in-junctive relief — that state officials be restrained from enforcing an order in contravention of controlling federal law — clearly satisfies” the requirements of an Ex Parte Young suit. Id. It noted that although Verizon’s claim for declaratory relief “seeks a declaration of the past, as well as the future, ineffectiveness of the [State] Commission’s action ... no past liability of the State, or any of its commissioners, is at issue.” Id. Even if the State Commission’s order was not inconsistent with federal law, “the inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim.” Id. at 1761.
Thus, Verizon Maryland authorizes our exercise of subject matter jurisdiction under § 1331 over both the challenges to the CPUC’s generic orders, which target existing interconnection agreements, and the Pac-West Order, which deals with arbitration of a new agreement. Before Verizon Maryland, there was little disagreement that state commission rulings enforcing arbitrated agreements or approving new interconnection agreements were subject to federal court review under § 252(e)(6). See, e.g., Southwestern Bell Tel. Co. v. Brooks Fiber Communications (Brooks Fiber), 235 F.3d 493, 497 (10th Cir.2000). It was unsettled, however, whether federal courts could review a state commission’s *1125 “interpretation or enforcement of an [existing] interconnection agreement,” Verizon Md., 122 S.Ct. at 1758-59, because only arbitration and approval are explicitly mentioned in § 252.
Verizon Maryland settled this question, concluding that nothing in either § 252(e)(6) or in the rest of the Act limited federal jurisdiction that would otherwise exist under 28 U.S.C. § 1381 over rulings that were allegedly violative of federal law. Id. at 1758-59. Indeed, rather than reading § 252(e)(6) as any sort of jurisdictional limitation, the Court stated that § 252(e)(6) “reads like the conferral of a private right of action.” Id. at 1759.
This reasoning applies with equal force both to interpretation and enforcement of existing interconnection agreements and to arbitration and approval of new agreements. Indeed, in light of its rulings, the Court found it unnecessary to consider whether 47 U.S.C. § 252(e)(6) provided an independent jurisdictional basis for the enforcement or interpretation of existing agreements. Verizon Md., 122 S.Ct. at 1758; see also id. at 1759 (“Section 252 does not establish a distinctive mechanism for the commission actions that it covers (the mechanism is the same as § 1331: district court review), and it does not distinctively limit the substantive relief available.”).
Both sides of this dispute also raise jurisdictional arguments under the Hobbs Act, 28 U.S.C. § 2342, in an attempt to limit each other’s arguments on review. We reject these jurisdictional arguments as well. The Hobbs Act gives the courts of appeals exclusive jurisdiction to “determine the validity of’ all FCC final orders. 28 U.S.C. § 2342(1); see also U.S. W. Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1123 (9th Cir.1999). The district court must dismiss a complaint if it directly attacks an FCC order or if it raises only issues that were conclusively decided by the FCC order. Here, neither side seeks to re-adjudicate issues that already have been conclusively determined by the FCC. At most, they merely ask the court to interpret the FCC’s rulings, to the extent that they are final and binding, and to determine whether the CPUC’s actions here were consistent with them and with the other authoritative sources of federal law.
IV. The Generic Orders
The First CPUC Order, issued after the California Telecommunications Coalition petitioned for a general ruling regarding the jurisdictional status of and billing treatment for ISP traffic, and the Second CPUC Order modifying the First in light of the FCC Remand Order, are contrary to the Act because they exceed the CPUC’s statutory authority over interconnection agreements. By its rulings, the CPUC determined that reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic in California. According to the CPUC, these orders were adopted as part of a generic rule-making proceeding that would affect all existing “applicable interconnection agreements” in California. However, the FCC has defined ISP traffic as “interstate” for jurisdictional purposes, thereby placing it under the purview of federal regulators rather than state public utility commissions. Under this scheme the CPUC lacks authority under the Act to promulgate general “generic” regulations over ISP traffic.
The CPUC’s only authority over interstate traffic is its authority under 47 U.S.C. § 252 to approve new arbitrated interconnection agreements and to interpret existing ones according to their own terms. By promulgating a generic order binding on existing interconnection agreements without reference to a specific *1126 agreement or agreements, the CPUC acted contrary to the Act’s requirement that interconnection agreements are binding on the parties, or, at the very least, it acted arbitrarily and capriciously in purporting to interpret “standard” interconnection agreements.
A. The CPUC has Limited Jurisdiction to Regulate Interstate Traffic
Although it is an unsettled question under federal law (and the primary controversy animating these appeals) whether ISP traffic is “local” for purposes of reciprocal compensation provisions in interconnection agreements, under § 251(b)(5), the FCC and the D.C. Circuit have made it clear that ISP traffic is “interstate” for jurisdictional purposes. See Bell Atl. Tel. Co. v. FCC, 206 F.3d 1, 5 (D.C.Cir.2000) (“There is no dispute that the Commission has historically been justified in relying on [end-to-end call] analysis when determining whether a particular communication is jurisdictionally interstate.”); see generally id. at 5-7 (distinguishing between jurisdictional analysis of what constitutes “interstate” or “intrastate” traffic, and the analysis of what constitutes “local” or “interex-change” traffic for the purposes of reciprocal compensation). Indeed, the FCC recently reaffirmed its position that “ISP-bound traffic is jurisdictionally interstate.” In the Matter of Starpower Communications v. Verizon South, Inc. (Starpower II), 17 F.C.C.R. 6873, 6886 (¶30), 2002 WL 518062 (2002).
Before the 1996 Act, the FCC had general rule-making authority to regulate “interstate” traffic and the states had general authority to regulate “intrastate” traffic. See 47 U.S.C. § 152; First Report & Order, 11 F.C.C.R. 15499 (¶ 83). The 1996 Act changed this division of labor somewhat; it granted the FCC regulatory authority over those intrastate matters governed by the Act, id. (¶¶ 83 103); AT & T v. Iowa Utils. Bd., 525 U.S. 366, 377-86, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), and it granted the state commissions limited defined authority over interstate traffic under §§ 251 and 252 of the Act, MCI Telecomm. Corp. v. Bell Atl.-Pa., 271 F.3d 491, 510 (3d Cir.2001); Southwestern Bell Tel. v. Pub. Util. Comm’n, 208 F.3d 475, 480 (5th Cir.2000).[10]
It is clear from the structure of the Act, however, that the authority granted to state regulatory commissions is confined to the role described in § 252 — that of arbitrating, approving, and enforcing interconnection agreements. As the Supreme Court noted in AT & T v. Iowa Utilities *1127 Board, the Act limited state commissions’ authority to regulate local telecommunications competition. 525 U.S. at 378 & n. 6, 885 & n. 10, 119 S.Ct. 721; see also MCI v. Ill. Bell, 222 F.3d at 342 (“[W]ith the 1996 Telecommunications Act, we believe it equally clear that Congress did take over some aspects of the telecommunications industry.”). The Act did not grant state regulatory commissions additional general rule-making authority over interstate traffic:
Under the Act, there has been no delegation to state commissions of the power to fill gaps in the statute through binding rulemaking ... State commissions have been given only the power to resolve issues in arbitration and to approve or reject interconnection agreements, not to issue rulings having the force of law beyond the relationship of the parties to the agreement.
Bell Atl.-Pa., 271 F.3d at 516.
Thus, the CPUC’s resort to its general rule-making authority under California law[11] to issue a generic order applicable to all interconnection agreements between telecommunication companies in California is precluded by § 252.
B. Retrospective Rule-making also is INCONSISTENT WITH § 252’S COMMAND that Interconnection Agreements are Binding
The CPUC’s resort to its general rule-making authority also is inconsistent with the Act because it effectively changes the terms of “applicable interconnection agreements” in California, and therefore contravenes the Act’s mandate that interconnection agreements have the binding force of law. See 47 U.S.C. § 252(a)(1). Indeed, the point of § 252 is to replace the comprehensive state and federal regulatory scheme with a more market-driven system that is self-regulated through negotiated interconnection agreements. See, e.g., Bell Atl.-Pa., 271 F.3d at 499 (“The Act’s clear preference is for [ ] negotiated agreements.”).
Arguably, there are other provisions in the Act that suggest that the CPUC may engage in general rule-making as part of its authority over interconnection agreements or its authority under state law. Section 252(e)(3), for example, provides:
Notwithstanding paragraph (2), but subject to section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.
And, section 251(d)(3) provides:
In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that—
(A) establishes access and interconnection obligations of local exchange carriers;
(B) is consistent with the requirements of this section; and
(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.
Finally, § 261(c) states:
Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate *1128 services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State’s requirements are not inconsistent with this part or the Commission’s regulations to implement this part.
These provisions are best interpreted, however, as indicating that state regulatory commissions may continue to regulate aspects of intrastate telecommunications service, as long as the state requirements are not inconsistent with the procompeti-tive intent of the Act. To do otherwise would undercut the purposes of § 251 and § 252 — to replace a state regulated system with a market-driven system that is self-regulated by binding interconnection agreements — and also would be inconsistent with the more specific requirements of the Act. For example, § 251(d)(3)(C) limits state commission actions under § 251(d)(3) to those that do not “substantially prevent implementation of the requirements of this section and the purposes of this part.” Similarly, § 261(c) provides that a state’s requirements may not be “inconsistent with this part or the Commission’s regulations to implement this part.” Section 253 also limits the requirements that a state may impose under § 252(e)(2) to those that are “competitively neutral,” 47 U.S.C. § 253(b). And finally § 252(d)(2)(B)(ii) makes clear that state regulatory commissions may not engage in rate making for reciprocal compensation under its § 252 powers.[12] Thus we reject any suggestion that §§ 252(e)(3), 251(d)(3) or 261(c) support the CPUC’s resort to its general rule-making authority to adopt the generic orders at issue here.
C. The Generic Orders Cannot be Acctj-rately Construed as Interpreting “Standard” Agreements Under § 252
Although the CPUC’s generic orders were adopted pursuant to its general rule-making authority, the district court suggested that in doing so, it was interpreting “standard agreements” under § 252. The record does not support this characterization of the two orders. It is clear from the record that when the CPUC issued its orders, it did not consider a specific interconnection agreement or even a specific reciprocal compensation provision. Furthermore, there is no evidence in the record that there was a “model” or “standard” agreement that the ILECs and CLECs in California followed in negotiating their interconnection agreements. To suggest that the CPUC could interpret an agreement without reference to the agreement at issue is inconsistent with the CPUC’s weighty responsibilities of contract interpretation under § 252. As noted by one court, “the agreements themselves and state law principles govern the questions of interpretation of the contracts and enforcement of their provisions.” Southwestern Bell v. Pub. Util. Comm’n, 208 F.3d at 485. But the CPUC relied on neither in its generic orders; indeed it could not have considered the terms of the agreements because the agreements never were made part of the administrative record.
We also note that the CPUC explicitly stated in its generic orders that it was purporting to make a general rule that would bind Appellants. Cf. Bell Atl., 206 F.3d at 9 (noting that it is improper to substitute a “judicial judgment” if the agency failed to offer a sufficient rationale *1129 for its determination). We therefore conclude that the district court erred in repositioning the CPUC’s orders as an interpretation of some form of a standard agreement.
D. Prejudice and Waiver Arguments
We also reject Appellees’ arguments that we should uphold the CPUC Orders because Appellants were not prejudiced or alternatively because Appellants waived their objections to the CPUC’s orders. First, Appellees argue that Appellants were not prejudiced because they have not “provide[d] even one example of an interconnection agreement including language that precludes the conclusion that its reciprocal compensation provisions apply to the ISP-bound traffic.” Appellees misconstrue the prejudice inquiry and misinterpret cases in which we have refused to invalidate agency action because the party challenging it could not show that he or she was prejudiced as a result of the alleged error.
Appellants clearly were prejudiced by the errors because the allegedly unlawful generic orders compel them, as carriers “subject to interconnection agreements containing reciprocal compensation provisions,” to make payments under those provisions for ISP-bound traffic. The fact that Appellants might also challenge the CPUC’s proceedings at another time does not mean that they were not prejudiced by the generic orders that they presently challenge. None of the parties suggest that the generic orders were not effective when issued by the CPUC or that Appellants have no obligation to pay reciprocal compensation as directed by the CPUC.
Second, Appellants did not waive their objection to the CPUC’s proceeding; on the contrary, in their motion for rehearing before the CPUC, Appellants argued that the CPUC’s orders were issued in excess of its authority and in violation of federal law. The CPUC had a sufficient opportunity to address fully the issues that Appellants have raised in their challenges to the generic orders. See Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1154 (9th Cir.2000). We also reject Appellees’ waiver-related argument that the CPUC did not err in issuing a generic order because the question posed to it was a generic one, and that if Appellants wanted the CPUC to resolve the reciprocal compensation issue with reference to specific interconnection agreements they should have presented these agreements to the CPUC.[13] To conclude that Appellants should have introduced evidence of the terms of specific interconnection agreements is to ignore the fact that it was the Appellees who were seeking to benefit from the ruling that they sought from the CPUC. It therefore was their burden to establish their entitlement to compensation under specific interconnection agreements. In any event, the parties’ failure to present key evidence does not permit the CPUC to act in excess of its statutory authority. In sum, we agree with Appellants that the district court erred in granting summary judgment in favor of Appellees.
V. The Pac-West Order
In the third appeal, Pacific Bell challenges the results of an arbitration proceeding before the CPUC, the Pac-West Order, in which the CPUC determined *1130 that ISP-bound traffic should be included in the interconnection agreement between Pacific Bell and Pac-West. Pacific Bell argues that this conclusion is inconsistent with the Act and was arbitrary and capricious, both for substantive reasons and because it claims that the CPUC was improperly influenced by extra-record evidence and ex parte communications. Because we conclude that the CPUC’s order is consistent with the Act and that Pacific Bell failed to demonstrate that any alleged improper influence created a triable issue of fact whether the order was arbitrary and capricious, we affirm the district court’s judgment upholding the Pac-West Order.
A. CONSISTENCY WITH FEDERAL LAW
Pacific Bell argues that the CPUC’s decision approving the arbitrated interconnection agreement between Pacific Bell and Pac-West, Decision No. 99-06-088 (June 24, 1999), is inconsistent with federal law[14] because (1) ISP-bound traffic is not local traffic under federal law, and therefore not subject to the mandatory reciprocal compensation requirements of § 251, and (2) the CPUC has no authority to impose reciprocal compensation payments on non-local traffic in the course of arbitrating a new contract.
Because the FCC has yet to resolve whether ISP-bound traffic is “local” within the scope of § 251, the CPUC’s decision to enforce an arbitration agreement that subjects ISP-bound traffic to reciprocal compensation was not inconsistent with § 251. We therefore reject Appellants’ argument that the CPUC exceeded its statutory authority by approving the payment of reciprocal compensation for ISP calls.[15] Indeed, following the D.C. Circuit’s vacatur of its Declaratory Ruling, the FCC itself abandoned the distinction *1131 between local and interstate traffic as the basis for determining whether reciprocal compensation provisions in interconnection agreements apply to ISP-bonnd traffic. See FCC Remand Order, 16 F.C.C.R. at 9155-57.
Pacific Bell also points to the same exceptions listed in § 251(g) that the FCC pointed to in its Remand Order to support its argument that the reciprocal compensation requirements of § 251(b)(5) do not apply to ISP calls. This argument, however, was explicitly rejected by the D.C. Circuit. See WorldCom, Inc., 288 F.3d at 430. Although the D.C. Circuit did not vacate the FCC Remand Order when it found that the FCC’s “reliance on § 251(g) [was] precluded[,]” its explicit rejection of the FCC’s use of § 251(g) as a justification for excluding ISP calls from reciprocal compensation provisions defeats Pacific Bell’s arguments that rely on § 251(g). WorldCom, Inc., 288 F.3d at 430. Furthermore, the interim alternative payment scheme for ISP-bound traffic established in the Remand Order applies only prospectively, when existing interconnection agreements expire. FCC Remand Order, 16 F.C.C.R. at 9189; see also WorldCom, Inc., 288 F.3d at 431.
B. Improper Influence
Pacific Bell.alleges that the district court erred in granting summary judgment to Pac-West because Pacific Bell’s evidence raises a triable issue of fact that the CPUC was improperly influenced and that it relied on extra-record evidence. Pacific Bell must show, however, that there is a triable issue of fact that the improper influence was such that it rendered the Pac-West Order arbitrary and capricious. See MFS Intelenet, 193 F.3d at 1117 (stating that consistency with federal law is evaluated de novo and all other issues are evaluated under an arbitrary and capricious standard). Pacific Bell fails to make this showing, and therefore we reject this claim.
Most courts have interpreted the arbitrary and capricious standard to grant broad deference to agency decisions. Cf. Global NAPs, Inc. v. FCC, 247 F.3d 252, 257 (D.C.Cir.2001) (“presumes the validity of [federal] agency action” under the arbitrary and capricious standard (quoting Southwestern Bell Tel. Co. v. FCC, 168 F.3d 1344, 1352 (D.C.Cir.1999))). Thus, to prevail on its claim, Pacific Bell must show that the CPUC’s order was not supported by substantial evidence, MCI WorldCom Communications, Inc. v. Pac. Bell Tel. Co., 2002 WL 449662 (N.D.Cal. Mar.15, 2002), or that the Commission made “ ‘a clear error of judgment,’ ” US W. v. Hamilton, 224 F.3d 1049, 1056 (9th Cir.2000) (quoting Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 573 (9th Cir. 1998)).
Pacific Bell points to several factors that allegedly indicate that the CPUC relied on matters outside the record. First, in his dissent to the CPUC’s Order denying Pacific Bell’s application for rehearing challenging its decision approving the Pac-West Order, Decision 99-12-025 (Dec. 2, 1999), Commissioner Josiah L. Neeper stated that the CPUC had received extra-record information about the effect of their decision on rural and Internet users, and that both the arbitrator and the CPUC mistakenly relied upon it. Second, the CPUC adopted the findings of the final arbitrator’s report, which stated that changing existing relationships could be harmful to rural customers of ISPs.
In addition to these statements in the Order, Pacific Bell points to four other events: (1) a series of e-mail communications directed at the CPUC and launched in May 1999, before the CPUC voted, which claimed that Pacific Bell wanted ISP calls tó be considered long-distance, increasing the charges to ISPs, (2) letters *1132 written by the Chairperson of the California Senate Energy, Utilities and Communications Committee and three other State Senators urging the CPUC to delay its vote, (3) press releases and a San Francisco Chronicle article that highlighted the possibility of political corruption in the Governor’s appointments to the CPUC, and (4) more press releases and articles that described how the CPUC was inundated with e-mails and letters complaining about alleged increased ISP prices.
Although Pacific Bell has presented some evidence that improper communications were sent to the CPUC, this evidence does not create a triable issue that the CPUC’s order was not supported by substantial evidence or that the Commission made a clear error of judgment. The CPUC’s decision was well-reasoned; it found that Pacific Bell’s proposed definition of local calls was inconsistent with CPUC and industry practice, and it also cited the FCC’s long history of treating ISP-bound traffic as local traffic. See Pac-West Order, Decision No. 99-06-088 at 7-10. The evidence of improper communications does not undermine this reasoning.
Indeed, Pacific Bell offers little evidence to show that the CPUC was actually influenced. It points to the CPUC’s adoption of the arbitrator’s report, which stated that changing relationships could be harmful to rural customers of ISPs.[16] The CPUC’s decision, however, contains no discussion of the arbitrator’s observation, nor does it express concern about alleged increases in ISP costs resulting from a denial of reciprocal compensation. The CPUC’s own press release announcing its June 24 decision, pointing out that if ISP calls are “deemed interstate” then “Pac-West would lose its reciprocal payments and might pass on the costs to ISPs” and “ISPs in turn might increase fees to their customers,” raises more questions than does the other evidence, but ultimately does little to undermine the reasoning of the Pac-West Order, because it does not contradict the Order’s valid reasoning and because it carries no legal significance of its own.
In addition, the fact that the CPUC commented on the possible impact of its decision after-the-fact in a non-binding press release does not tend to show that the Pac-West Order itself was a clear error in judgment. The numerous e-mails, letters, articles, and press releases also fail to demonstrate legal error in the Commission’s decision. Pacific Bell thus has failed to provide sufficient evidence to create a triable issue, under our deferential standard of review, that the CPUC was improperly influenced by public and political opinion.
Conclusion
For the reasons stated above, in appeal numbers 01-17181 and 01-17161, we REVERSE the district court’s summary judgment upholding the two CPUC generic orders. In appeal number 01-17166, we AFFIRM the district court’s summary judgment upholding the Pacific Bell / Pac-West interconnection agreement. Appellants in appeal numbers 01-17181 and 01-17161 shall recover their costs on appeal. Appellees in appeal number 01-17166 shall recover their costs on appeal.
Appeal No. 01-17181 REVERSED
Appeal No. 01-17161 REVERSED
Appeal No. 01-17166 AFFIRMED

. Section 251(h)(1) of the Act defines an incumbent local exchange carrier as follows:
For purposes of this section, the term 'incumbent local exchange carrier’ means, with respect to an area, the local exchange carrier that—
(A) on February 8, 1996, provided telephone exchange service in such area; and
(B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission’s regulations; or
(ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).
47 U.S.C. § 251(h)(1).

. Section 251(a)(1),of the Act sets forth the general duties of telecommunications carriers to interconnect with the facilities and equipment of other telecommunications carriers. Section 251(c)(2) describes the specific obligations of incumbent local exchange carriers with respect to interconnection: The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—
(A) for the transmission and routing of telephone exchange service and exchange access;
(B) at any technically feasible point within the carrier’s network;
(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and
(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.
47 U.S.C. § 251(c)(2).

. Unless otherwise indicated, ''Appellants” refers to Pacific Bell and Verizon California, the two ILECs.

. Unless otherwise indicated, "Appellees” refers to the California Public Utilities Commission ("CPUC”), Pac-West, and the other CLECs involved in this case: AT & T Communications of California, Inc.; ICG Telecom Group; MCIMetro Access Transmission Services, Inc.; MFS Intelenet of California, Inc.; Teleport Communications Group Inc.; World-Com, Inc., and Winstar Telecommunication, Inc. The Appellees also include Richard A. Bilas, President of the CPUC; Carl W. Wood, Commissioner of the CPUC; Henry M. Du-que, Commissioner of the CPUC, Josiah L. Neeper, Commissioner of the CPUC; and Joel Z. Hyatt.

. 7 U.S.C. § 252 reads in relevant part:
Procedures for negotiation, arbitration, and approval of agreement
(a) Agreements arrived at through negotiation
(1) Voluntary negotiations
Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.
(e) Approval by State commission
(1) Approval required
Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

. The Coalition was originally named as a defendant in the suits regarding the CPUC’s generic orders, but it subsequently was dismissed from the case.

. The FCC defined “bill and keep” as:
an arrangement in which neither of two interconnecting networks charges the other for terminating traffic that originates on the other network. Instead, each network recovers from its own end users the cost of both originating traffic that it delivers to the
other network and terminating traffic that it receives from the other network.
In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic, 16 F.C.C.R. 9151, 9204 n. 6 (2001).

. We review de novo the district court’s grant of summary judgment. US W. Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir.1999). Questions of Eleventh Amendment immunity are reviewed de novo, *1124 Demshki v. Monteith, 255 F.3d 986, 988 (9th Cir.2001), as are questions of subject matter jurisdiction, Wilson v. A.H. Belo Corp., 87 F.3d 393, 396 (9th Cir.1996).
With respect to the merits of Appellants' challenges, we review de novo whether the CPUC’s orders are consistent with the Act and the implementing regulations, and we review all other issues under an arbitrary and capricious standard. Id.; see also MCI Telecomm. Corp. v. U.S. West Communications, 204 F.3d 1262, 1266-67 (9th Cir.2000).

. 47 U.S.C. § 252(e)(6) provides in relevant part:
In a case in which a State fails to act ... the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and section.

. Under the Act, it may not even matter whether ISP-bound traffic is interstate or intrastate, because the Act grants the federal government substantial new authority over intrastate matters that are specifically addressed within the provisions of the Act. Iowa Utils. Bd., 525 U.S. at 378 n. 6, 119 S.Ct. 721 ("[T]he question ... is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has.”).
To the extent that the states previously had authority over interstate traffic as a necessary incident to the regulation of intrastate traffic, the Act sets up: a scheme in which Congress has broadly extended its law into the field of intrastate telecommunications, but in a few specified areas (ratemaking, interconnection agreements, etc.) has left the policy implications of that extension to be determined by state commissions, which — within the broad range of lawful policy-making left open to administrative agencies — are beyond federal control.
Id. at 387 n. 10, 119 S.Ct. 721. Under this new scheme, the state commissions are " 'deputized' federal regulators,” MCI Telecomm. Corp. v. III. Bell Tel. Co., 222 F.3d 323, 344 (7th Cir.2000) and are confined to the role that the Act delineates, see Bell Atl.-Pa., 271 F.3d at 516.

. The limited rule-making authority the CPUC maintains under California law is established in the California Constitution and the California Public Utilities Code. See Cal. Const, art. XII; Cal. Pub. Util.Code §§ 216, 234, 453.

. Section 252(d)(2)(B)(ii) provides that § 252 shall not be construed "to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls...."

. On June 11, 2002, Appellants filed a motion requesting that we take judicial notice of three Verizon interconnection agreements. Appellants sought to present these documents in support of their claim that the CPUC generic orders were arbitrary and capricious. Because we hold that the CPUC’s failure to consider any specific agreements rendered its decision arbitrary and capricious, we deny the motion as moot.

. In U.S. West v. Jennings, 304 F.3d 950, we held that all valid implementing regulations in effect at the time that we review district court and state regulatory commission decisions, including regulations and rules that took effect after the local regulatory commission rendered its decision, are applicable to our review of interconnection agreements. 304 F.3d 950, 956 (9th Cir.2002). Thus, if any ruling or directive in the FCC Remand Order or other regulations issued by the FCC after the CPUC issued its decision rendered the CPUC's decisions violative of the Act, we would apply the new regulations and invalidate the CPUC's orders. However, there is nothing in the FCC Remand Order that undermines the validity of the CPUC's Pac-West Order. As noted, in WorldCom, Inc. v. FCC, 288 F.3d 429, 430 (D.C.Cir.2002), the D.C. Circuit rejected the FCC's reliance on § 251 (g) in its Remand Order to carve out an exception for ISP traffic so that it would not be subject to reciprocal compensation pursuant to § 251(b)(5). Furthermore, the FCC Remand Order’s transitional, prospective regime — bill and keep — for intercarrier compensation for ISP calls takes effect only as pre-existing contracts expire. See FCC Remand Order, 16 F.C.C.R. at 9186-97. Here, the current FCC regulations as set forth in the Remand Order do not conflict with the CPUC’s arbitration decision and therefore the CPUC ruling approving the Pac-West arbitrated agreement is consistent with the Act.

. Appellants also argue that the CPUC had no authority to approve the inclusion of ISP reciprocal compensation in an arbitration proceeding because it is not an "open issue” within the meaning of 47 U.S.C. § 252(b)(1). Appellants assert that ISP calls are non-local and therefore reciprocal compensation for these calls cannot be considered a required statutory obligation; thus, ISP-bound calls are not among the open issues within the scope of negotiations over which the CPUC may exercise authority under § 251(c)(1). However, because ISP-bound traffic is not treated as interstate traffic as a matter of federal law, we conclude that the CPUC's decision was well within its authority. Furthermore, because there is no conflict between the CPUC’s arbitration decision to approve reciprocal compensation for ISP-bound calls and federal law, § 251(b)(5) does not preempt a state commission like the CPUC from approving of the inclusion of ISP-bound traffic in reciprocal compensation provisions.

. In addition, most of the evidence that Pacific Bell presented does not support its contention that the arbitrator was improperly influenced because the events that allegedly would have influenced him occurred after the arbitrator issued his report in April 1999.